14283, Double Eye Associates v. Mass Mutual Life Insurance, oral argument not to exceed 15 minutes per side. Good morning. It please the court, co-counsel, Dr. Smith, Dr. Jones, I represent the appellants and I will reserve three minutes for its pleasure. The issue on this appeal is obviously whether the district court erred in granting summary judgment on a statute of limitations issue. It's our position and I think the record clearly reflects that the summary judgment standard itself was misapplied by the district court. It's unfortunate, but if you look at the opinion, I think a number of credibility determinations were made when they should not have been. I think there are numerous issues involving inquiry notice that really are issues not subject to summary judgment. We cited you a number of cases that basically say that any inquiry notice in terms of the triggering of the statute of limitations has to be decided in a contextual analysis. In fact, Judge Gibbons in a security case, the Nolfi case, you used a similar analysis. You said that you need to look at the sophistication and expertise of the plaintiff in financial matters, the existence of a long-standing business and personal relationship, the existence of a fiduciary relationship, and whether there's any opportunity for fraud or concealment. Now that was a securities case, but here we have, if you look at the really uncontradicted facts, you have a man named Thomas Ackerman, who was the first cousin of Dr. Smith. He presented a plan, said it would be handled through Mass Mutual. Basically, according to the testimony that's uncontradicted, the doctors say they never saw a list of policies. In 2007, when they say they learned, probably the best evidence that they didn't know is they cashed the policies in. These participants, hardly to a person, cashed their policies, the whole-life policies that Mr. Ackerman had bought surreptitiously. Now look at the facts that are uncontradicted. There's no evidence that says the doctors knew. The case relies entirely... I mean, the issue really here is whether they should have known. Fair? It is. I mean, we ought to just think of it in those terms. Whether they knew or should have known, and in terms of the should have known, it's an inquiry notice. Whether they should have been on inquiry notice. Every case that we found, either district court or circuit court, involving similar facts, have denied summary judgment. You have the Maryland case, Meyer v. Berkshire, where Mazaros... Well, every one of these cases is going to vary. I mean, it's just very fact-intensive. They are fact-intensive. I agree with that. I mean, let's say, hypothetically, I know you don't think this is your case. Let's say there's a plan. The plan trustee is a professional person, very busy. The agent is sending invoices every month or some sort of notice that would have within it a listing of how many policies are being purchased. And the trustee, because he trusts the agent, basically is just throwing those letters in the garbage every month unopened. And then at some point, you know, well after the fact, he discovers he's been defrauded. Is that person on inquiry notice when they're receiving those letters that they throw out unopened? It depends upon the... On that hypo. In that type of situation where they don't open them. Right. That may be. In this situation, you have a woman who was... She's still an employee. She's been there for over 30 years. I mean, this is a small rural community, 25,000 people in Dublin. It's a practice that has an average tenure of Miss Mallory and others 17, 18 years. They have three employees that have been with them over 35 years. What she did was administrative. It was not discretionary. Well, I mean, but doesn't that... I mean, either she was his agent for this purpose and he's imputed with her failure to pay attention to this, or she's not his agent for this purpose and that means it's still incumbent upon him to take the time to look at these things. Why is that incorrect? I don't disagree with what you're saying except that if you look at the facts that are uncontradicted here, they believe they have delegated everything to Thomas Ackerman. Here's what Mrs. Mallory said. Volume 1, page 147. That's sort of like delegating the duty to be on inquiry notice. I don't know if you can do that. Well, I mean, they relied on him entirely. And, you know, how can you ignore, in this case, applications that were forged? There are 34 forgeries here. You have concealment in the form of taking the last signature page of prior applications, a horrible policy that MassMutual had. They changed it apparently after they learned of this or some other situations where on an insurance application you could take the last page that had been signed previously and just put it with another new application. The best proof is in 2007 they all cashed their policies in. They didn't want them. They didn't know about them. They all thought they had one or two. Well, I mean, I think at this stage of the case, nobody's disputing that there might have been fraud or concealment. But you still have a limitations period to contend with, even in that instance. Yes, you do. And the issue is, is it fair or is it reasonable when you're looking at an inquiry issue, inquiry notice, to grant summary judgment? The cases say no. Surely you're not saying that there cannot be a set of facts under which a district court would grant summary judgment based on inquiry notice, based on a conclusion that the person should have known, based on inquiry notice. I'm not saying that, Your Honor. I'm saying those are rare, rare cases, and this is not one of those cases. If you look at the Paris v. Regions Bank, unless the evidence permits only one conclusion, whether a plaintiff has inquiry notice is a question of fact. Right, and questions of fact every day get decided on summary judgment as a matter of law, every day. So it's just, I think we need to get beyond sort of abstractions about the nature of, you know, inquiry notice or these cases and really talk about these facts and whether your client should have been looking at some of the paperwork that came into the office. I don't believe they should have under the circumstances, and the only basis for doing that is to say that Mrs. Mallory, who was a secretary and then later an office manager, had a duty to look. In fact, she testified. See, that's not the only way to say that. I mean, individuals have some duty at whatever level to keep up with whatever it is they own and how whatever they own is doing. I mean, you know, an average person, even an average busy professional, would probably, thinking down the road a little bit, at some point want to know what his financial future looked like or his family's financial future. So, I mean, there's some duty apart from that, and I'm not sure at what level you fix it. Well, look at what Dr. Smith said. We quoted it in the reply brief. He said, I've said this many times. I was terribly interested in what was going on, but I got all my information through the filter of Tom Ackerman, who I trusted implicitly to tell me what I needed to know, explain every detail that I needed to know, and I was more than willing to give Mr. Ackerman the responsibilities to do this. Don't paint the picture that I was a disinterested employee and didn't care. That's what he said. But the question is whether, you know, when we have a should-have-known standard, that imputes some reasonableness. Reasonableness is required. And is it reasonable to just put complete faith in the concealer here? I mean, if so, then there might not really be a limitations period for practical purposes in many of these cases. In a fiduciary relationship, that's a key factor. In every case that has looked at— Fiduciary is your client here, as I understand it. I'm not so sure about the agency. No, I think that the district court never decided the issue, but Mr. Ackerman was clearly a planned fiduciary. So was Quality Plan Systems, the third-party administrator. As a matter of law, the third-party administrator is under the ERISA provisions. May I ask you something? My understanding of the state of the proof is that, yes, there's evidence about total reliance by the doctors on Mr. Ackerman, and there may be that evidence about the interest of the doctor. But there's not any evidence that I'm aware of that gets any more specific than that. I mean, for example, this would be a far different case if the doctor said, about a certain time frame or on a certain date, I went to Mr. Ackerman, I asked him to review with me what the assets were, I asked him to go over with me what arrangements he'd made concerning pension, life insurance, and so on, and he gave me a false answer. He did. Well, is it specific, though? Yes, absolutely. Is it specific as to date? And what dates did it occur that would bring this within the limitations period? He came to see them up until 2006, three, four times a year. Initially, he gave them reports that were simply handwritten notes. He explained and focused on growth, told them that everything was fine, everybody was going to get rich, everybody was going to have a nice result at the end of the tunnel when they retired. He controlled documents. There's uncontradicted evidence that he was provided with reports by QPS to deliver. The doctors say, I didn't get them. Until things went online on computer, he had complete access to all the files in Dublin Eye's offices. He discarded and destroyed certain of the documents. But they asked him. Every year they had an annual meeting. He said everything was fine. They were stunned in 2007. How come they didn't bring suit for three or four years after that? I think you have to know. We wouldn't be having this conversation if they had just sued with him. You want to know my answer? Yeah, that's why I asked. Look at them. They do charitable work. They go to the Himalayas and do free eye surgery. They take off months at a time to help other people. They're in a small community and they trusted Mr. Ackerman. They are not suspicious, naturally suspicious people. Would you be suspicious of your first cousin? If you turned over the responsibility for a pension plan, he says he has a big company like Mass Mutual to take care of it. None of us in this room would be suspicious initially of their first cousin. Particularly where he comes three or four times a year and tells you everything is okay. Where he's controlling the files. Where he's taking things out of the drawer. Answer my question. Well, I think that has to be decided. This has to be in any inquiry notice you have to look at all the facts. You have to decide the case in a textual analysis. With a textual analysis. And I think when you do that. And you know the most important thing here is this court is guided by other decisions obviously. If you look at the Chaban v. Cresito case. Or if you look at the Mazaros conduct in the other case. It's always they trust someone. It's always he gives informal reports. He controls the data. These things don't happen unless you have absolute trust in someone. And it wasn't unreasonable given the first cousin relationship. The periodic visits that Ackerman made to Dublin. I think you're out of time. I'm sorry. I appreciate you giving me a little extra time Judge Kessler. I hope I've answered your questions adequately. I've done my best. Thank you. Thank you. May it please the court. My name is Barbara Edelman. And I'm here on behalf of all of the appellees in this case. I think the court has honed in right where we ought to be. And that's the question to be addressed that was addressed by Judge Forrester. When did these trustees know? Or when should reasonable trustees have known about the multiple policies that were acquired in the plan between 1980 and 1998? Let us not forget that the plaintiffs in this case are trustees. There's law in this circuit about what the everyday man ought to know. There's law about what employees under their pension plan, what is it that they ought to do to give themselves notice or what would the standard be for inquiry notice. And we look at cases such as the Brown versus Owens Corning case that talks in terms of employees in a plan and what they ought to do to inform themselves about their own investments or about things that are included in an ERISA plan for them. And the court's pretty clear and pretty straightforward. You need to read your statements. You need to read statements that are sent to you. Or in the case of Brown, which involves employees at a company, the court went so far as to say if you have access to information such as information online and you're advised how to access that information, you have a duty to access it. Is it at all disputed in this case that the invoices recited all the different policies? I mean, there are allegations that documents were destroyed. Have the plaintiff, have the doctors in this case said, yeah, those invoices included the policy numbers? Or is that less than clear? It's not disputed, Your Honor. And what testimony would you point us to? I would point you to the invoices themselves and the invoices at Exhibit 21 attached to our motion for summary judgment. How do we know those actually got sent to this office? Because they were found in Ms. Mallory's credenza. There were 19 years of invoices that the QPS group and MassMutual were able to find going back as far as we could go back in our records. What exhibit was that? Exhibit 21, docket entry 265 and 23. I'm sorry, please. And just for clarification, that's where the invoices are located in the record attached to our motion for summary. But the evidence, Your Honor, is undisputed. Those would be the portions of the invoices that were not the coupon that was torn off? Correct. You're saying those invoices recite or make clear the number of policies that were purchased? Absolutely, Your Honor. I collected and brought today, and I know I can't do visual aids, but somehow it made me feel better to put my hands on them. And I collected the invoices. We found and they produced nine years of invoices that were still sitting in the credenza behind Ms. Mallory's desk that come in and the invoice shows how much do you owe, and the invoice is then backed up with a list. And the list demonstrates every policy for every person. Does it say the person's name? Yes, sir. So it would be apparent looking at it that somebody has more policies than expected? Your Honor, it is completely impossible for anyone, anyone to suggest to this you do not see, because you do see, starting right here, Dr. J.Y. Jones, life insurance, gross amount due, the number on the policy, the amount, and the amount due in premium. Below it, Dr. J.Y. Jones, the next policy, the number on the policy, the amount due, the premium. And it goes through here. These first seven are Dr. Jones. Down at the same page, there's about nine in a row that are Ms. Mallory. It is impossible for anyone to look at this and with a straight face say, how would we know? That's what this is. It's the premium for the separate policies. When one of the replacement trustees, Dr. Smalley, was shown this list in the deposition, I said, sir, is it clear to you that this is a list of multiple policies? And he said, yes. I said, can you think of any reason why Ms. Mallory, when she saw this, wouldn't have been able to reach the same conclusion? He goes, I don't know why she couldn't. It's obvious. If you read it. If you read it. These are the invoices, and as I said, the testimony is they were sent. They could maybe dispute, because we couldn't prove the invoices during the 80s. No one could find them. But there is the proof that the premiums were paid. It is undisputed that our proof was the invoices that were sent in the 90s were the same as the invoices that were sent with the 80s that show the itemization. And this isn't the only thing. While this was found at the DEA offices, sitting in the credenza behind her desk, where they had removed the slip, gotten these very substantial checks for $40,000, $50,000, $60,000 a year that the doctors would just sign off on, apparently without needing to know, caring to know, making any effort to know, that they paid those premiums every year for something. They wouldn't argue it was just for one or two policies, but no one looked to see what they were buying. I take you back again. Trustees. They're making investment decisions. These were documents. And this is important. You heard my opponent say, Mr. Ackerman controlled everything. Mr. Ackerman didn't control these invoices. He didn't send these invoices. He had MassMutual. That came directly from the company, did not pass through him. That's correct. There were other statements, Your Honor. And I have a whole list. Cost of insurance reports found at Exhibit 23 to the Motion for Summary Judgment. The cost of insurance reports, another document that came into their offices. And on this document, if you look through it, it goes through and itemizes with a breakdown, person by person, how many policies, policy numbers. That's sent by MassMutual? The cost of insurance report, I believe, was sent by QPS. Can I ask, are there any documents that were discovered that were created by Mr. Ackerman that would have been reassuring in some way with respect to their situation? No. No, Your Honor. There's no evidence of any documentation that he sent that misguided, misled. There is no testimony other than they did come with some testimony about perhaps he intercepted things. Mr. Getty just now ---- About his, you know, constant phone calls. I mean, we do have to presume at this stage of the case that in all these phone calls, et cetera, he probably was making lulling type statements. Fair? Your Honor, I think it's fair to say the testimony definitely was from the doctors that the good friend and cousin did say things like, I'm handling everything. Everything's going great. Everything's fine and dandy. They don't have testimony at any point in the 25 years of this ordeal other than they said at the first meeting he supposedly said there will be one or two policies in each person's account. They didn't offer any testimony that 10 years later he said you still only have two or 15 years later he said you still only have one. It would be absurd for him to have said that. Don't forget, the doctors are signing and signing and signing dozens and dozens and dozens of applications for policies. And their position is we don't read. We don't read what we sign. We don't care what we sign. We just sign it. So they're signing dozens of applications. The testimony, their testimony was Mr. Ackerman would come down with boxes full of materials and pass out policies. There are policy receipts where people received multiple policies. We have proof in the record, not just the invoices, not just the cost of insurance. Let's talk about surrender forms. In 1997, Dr. Smith got out of the plan. He personally signed nine surrender forms, surrendering nine individual policies. He says, oh, that's the first time I realized I had more than two. That was in 1998. He then realized he had more than two. What did he do? Did he say anything? Did he go to anyone? Did he say, wait a minute, Tom, what's up with this? How could I be signing nine forms? I only had two policies. He said he chose not to confront Mr. Ackerman. Okay, that's his choice. But he did have to testify. He had to admit, isn't it true, sir, at that point in time, you as trustee at that point knew you had nine policies. Yes, I knew that at that point. Not only that, Dr. Jones signed as the witness on the nine policies in 1998. What more can an insurance company as a defendant or an insurance agent as a person do or show or demonstrate than to actually have pieces of paper that acknowledge I have these multiple policies? What more could we have? We don't have a videotape of the doctors having a eureka moment. But we do have uncontroverted documentation that shows for 25 years they revised how many policies they had in paperwork. We have uncontroverted documentation that shows they signed surrender forms and cashed in multiple policies and not just Dr. Smith. Becky Thomas was another person who cashed in four policies. Cynthia Thomas cashed in four policies when she left the company. Becky Soles cashed in multiple policies when she left the company. And Dr. Smith signed off on it. These doctors take the position they shouldn't have to read. Quote, they're busy. Well, and I know Mr. Getty wanted to portray it as everyone's off doing humanitarian work and therefore they're unable to tend to business. Well, then they should resign as trustees. I can't imagine having to stand here and tell this court that trustees, of course they have a fiduciary duty. They're in charge of the plan. It can't be an appropriate position or a precedent that this court would want to accept that says trustees can put their head in the sand and claim not their fault because they trusted their insurance agent. Are you aware of any case that says our determination of inquiry notice and what's reasonable is affected by the fact that the plaintiff was a trustee? Your Honor, I don't have a case I don't think right on point for inquiry notice and a trustee. I think what we instead relied on was just generally the duties, the higher duties of trustees. I mean, and I understand where you're coming from, but you're sort of advocating a tougher inquiry notice standard because they're trustees. Well, I am saying, Your Honor, when you look at what is the standard of the reasonable, prudent man, I think you do look at the circumstance. And I think as you said when we started here, they're very fact specific. And I think it's one thing if you're a low-level employee and you're counting on others at your company to do what was right in your pension plan, what's reasonable there? I'm saying when you are a trustee and you brag about the fact that you never read one document, something's wrong. And I do think for a trustee who had a duty, a duty to read the materials, because he was investing other people's money, I think you do analyze that with a higher standard, that it's impossible to fathom that they could take the position of willful ignorance as trustees and have that be acceptable and just say, Well, I trusted the insurance agent. He was my friend. Well, probably everybody's insurance agent is their friend. Probably everybody's stockbroker is somebody they like. Probably every investment advisor is somebody that you're drawn to because you thought they were a good guy. That's not an excuse. These are trustees. These are trustees who were supposed to know. And it does strike me as interesting. Let's say that they said, Well, we didn't know that the investment was in insurance. Well, then where was the investment? Where was that money? Because you don't know. You paid no attention. Let's look at what Dr. Jones said when asked. The first year of the plan, before you had a chance for your investments to do well, before that happened, and when you didn't know if your investments were doing well or not, how much time did you spend per week on the plan? Answer. Practically none. The second year, how much time did you spend per week on the plan? Answer. Put ditto all the way down through the relevant period. So your answer to the second year is that you spent practically no time on the plan? Amen. Is that a yes? That's a yes. Okay. The third year, how much time did you spend approximately per week on the plan? Zero. The fourth year, sir. I don't think you have to go through every year. And I agree. Maybe that's overkill. The bottom line is, Your Honor, how do we excuse that? How do we say, well, that's good enough? You had a friend. I realize my time is up. I do appreciate the opportunity to address the court. And I would ask that you please affirm what I think was a very solid decision by Judge Forrester. Thank you. Well, we all have an obligation not to twist or exaggerate. So I don't think the testimony shows that anyone bragged. Well, let's talk about the nine years of invoices. I mean, those were there, right? They were. And would you agree that any reasonable person who actually looked at it would realize that there were multiple policies for individual people? No. And I'll tell you why. Okay. If you do anything, take the time to go read the deposition of Gary Huffman. He was the general agent in Lexington. He's now the president of Ohio National Insurance Company here in Cincinnati. Okay. I took his deposition, and I gave him one of the documents. I want to know whether somebody looking at the piece of paper would realize that more than one or two policies were being purchased for each. He said no. Who's he? Mr. Huffman. He didn't. He was shown an invoice. He was shown one of the invoices that had a list of various policies, and he said, I can't tell what they are. I can't tell whether they're annuities. I can't tell whether they're insurance policies. They say their life on the document that Ms. Elmer was referring to. I looked at it. I mean, I didn't look at that specific one, but I've looked at them. They have the name of the individual. They have, you know, under a column for, you know, type of investment or type of policy. It says life, and, you know, there are multiple listings for each individual. Mr. Huffman was the general agent. I showed it to him, and he said no one could tell for certain what they were. They're annuities. They're other products, you know, mass mutual products. You call an annuity a life insurance policy? Annuity is insurance. It's a form of insurance. When you refer to life insurance policy, you're typically referring to a policy insuring the life, either term or whole life, or I think there's some variable kinds of things. But, I mean, you know, you could particularize it further. But if it's an annuity, you'd say it's an annuity, wouldn't you? Not necessarily. You really got to look at what Mr. Huffman said, because he said he couldn't tell. No one could look at that. If it says life, you'd think it was life, and further inquiry might reveal it was something else. But I don't believe that it's, I'm not sure that you can argue that people who didn't even look at any of these things would be then, and who claim not to be sophisticated in these matters, I'm not sure that you can claim that they would have seen the words life and thought that meant something else. Well, I can only tell you what the testimony is, and it's disputed, given the testimony of Mr. Huffman. I mean, there's obviously, in my view, a question, a material question, about the reasonableness or the reliance on Mr. Ackerman. They did read summary reports. They were handed to him by Ackerman, or given to him, which were general in nature. They've testified at that. And, you know, they didn't brag about, there's a total exaggeration to say they bragged about not reading things. They read things. Well, that was advocacy, and we, you know, we have enough, we have enough, we have enough. They were given blank, you know, in terms of the applications, they were given numerous blank forms. How about the signing the surrender forms? The surrender forms were blank forms. Well, you know, I mean, and we're going to sign an opinion that says that's fine, that's reasonable. Keep signing blank forms, and you'll be fine under the law. Well, that's what Ackerman did. He gave them numerous blank forms. Okay, but, I mean, we're, I mean, we have to decide what the law requires. And you're asking us to say it's fine to sign all the blank forms you want, and the limitations period won't run. Do you have a pension plan? Stop asking me questions, please. Well, I mean, the point is I've signed numerous forms. Okay. I've talked to other people who are very intelligent. When you trust someone, they put it in front of you like Ackerman did here. You do that, and that's not unreasonable. I do understand your argument. Perhaps you can speak for yourself, but your time is up. All right, thank you. Appreciate it. Okay, we appreciate the argument both of you have given, and we'll consider the case carefully.